**LYNCH CARPENTER, LLP**
(Eddie) Jae K. Kim (SBN 236805)
ekim@lcllp.com
Tiffine E. Malamphy (SBN 312239)
tiffine@lcllp.com
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
Tel.: (619) 762-1910
Fax: (724) 656-1556

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

SIDNEY JONES and BRIAN FOX, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

PERION NETWORK LTD,

Defendant.

Case No: '26CV4501 BTM VET

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Sidney Jones and Brian Fox (collectively, "Plaintiffs") bring this action, on behalf of themselves and all others similarly situated, against Defendant Perion Network Ltd. ("Defendant" or "Perion") and allege the following upon personal knowledge as to their own actions and upon information and belief as to all other matters:

## INTRODUCTION

1. This case involves Defendant's participation in the hidden mass surveillance system implemented on nearly all websites that tracks, stores, builds, and sells vast amounts of personal data of the website visitors, without their knowledge or consent, and causes them harm. When people visit a website, they understand that they are interacting with the owner and operator of the website, but it is impossible to understand, let alone for the website operator to disclose, the full scale of what is happening to people's personal data behind the curtain of the website interface, which involves countless brokers and advertisers profiting from that data that have no visibility to or relationship with the website visitors.

2. In mass, automated backroom deals, data brokers sell profiles of every internet user to the highest bidder and, within seconds of loading a webpage, the user will be bombarded with targeted ads based on one of a 1,000 different data points offered up at auction. This data includes names, addresses, email addresses, IP addresses, phone numbers, digital fingerprinting of every device, permanent internet identifiers that function as social security numbers that are tracked across numerous websites, browsing and sales patterns, interests and preferences, political beliefs, religious affiliation, health concerns and treatments, relationship status, and personal finances, among many other categories. Most users are unaware of these deals or the number of websites that data brokers use as sources to create extremely invasive and comprehensive user profiles. By selling and sharing the profiles of one website user across numerous websites with other data brokers that are doing the same, each data broker exponentially increases the scale and scope of personal information it compiles for each person.

3. Perion is one of those data brokers and this litigation arises out of its backroom deals of user profiles created through device fingerprinting and tracking cookies without the knowledge and consent of website users – and in fact, without *any* relationship with website users at all.

4. Plaintiffs' and the Classes' personally identifiable information ("PII") and related user profiles were taken by Perion to fuel the real-time bidding ("RTB") industry for targeted ads, which is worth hundreds of billions of dollars.

5. Plaintiffs bring this action on behalf of themselves and the Classes to shine a light on this cloak and dagger enterprise while vindicating their constitutional rights to privacy and the damages caused by Defendant's collection and sale of their PII.

## PLAINTIFFS

6. Plaintiff Sidney Jones is a natural person and a citizen of California, where he intends to remain. Plaintiff Jones currently resides in Chula Vista, California.

7. Plaintiff Jones visited www.biblegateway.com ("Bible Gateway") multiple times over the past year while located in California. Defendant's Undertone tracker was embedded on Bible Gateway and, unbeknownst to Plaintiff Jones, Perion continued to collect his PII while he interacted with the religious website Bible Gateway, including searching for and viewing webpages

containing Bible verses. On information and belief, Defendant tracked Plaintiff Jones' interactions with this website and across other websites in real time, including collecting, among numerous other data points: 1) identifying information; 2) IP address; 3) persistent cookie identifiers; 4) search terms; 5) detailed URLs of webpages visited; 6) web browser; 7) device operating system; and 8) general website topics. Defendant aggregated the collected information, synced that information with data collected by other data brokers, resolved his identity, enhanced and built a comprehensive profile of Plaintiff Jones' activities, interests, beliefs including religious beliefs, habits, modes of living, and devices, and sold that information to numerous advertisers and other data brokers.

8. Plaintiff Jones intends to visit Bible Gateway and other websites in the future and will continue to have his data collected and sold to advertisers and other data brokers despite not consenting to such conduct. Plaintiff Jones has no choice but to continue using the Internet to participate in society and conduct the routine affairs of daily life. Accordingly, Plaintiff Jones' PII will continue to be collected and sold by Defendant without his consent.

9. Plaintiff Brian Fox is a natural person and a citizen of California, where he intends to remain. Plaintiff Fox currently resides in Murphys, California.

10. Plaintiff Fox visited www.mediaite.com ("Mediaite") multiple times over the past year while located in California. Defendant's Undertone tracker was embedded on Mediaite and, unbeknownst to Plaintiff Fox, Perion continued to collect his PII while he interacted with the news website Mediaite, including searching for and viewing webpages regarding political and national news and commentary. On information and belief, Defendant tracked Plaintiff Fox's interactions with this website and across other websites in real time, including collecting, among numerous other data points: 1) identifying information; 2) IP address; 3) persistent cookie identifiers; 4) search terms; 5) detailed URLs of webpages visited; 6) web browser; 7) device operating system; and 8) general website topics. Defendant aggregated the collected information, synced that information with data collected by other data brokers, resolved his identity, enhanced and built a comprehensive profile of Plaintiff Fox' activities, interests, beliefs including political beliefs, habits, modes of living, and devices, and sold that information to advertisers and other data brokers.

11. Plaintiff Fox intends to visit Mediaite and other websites in the future and will continue to have his data collected and sold to advertisers and other data brokers despite not consenting to such conduct. Plaintiff Fox has no choice but to continue using the Internet to participate in society and conduct the routine affairs of daily life. Accordingly, Plaintiff Fox's PII will continue to be collected and sold by Defendant without his consent.

**DEFENDANT**

12. Defendant is "an AI-native execution infrastructure company for modern advertising" that pioneers an "ecosystem of technology solutions" based on its "proprietary technology and strategic acquisitions." *Investor Relations*, PERION, https://perion.com/investors/ (last accessed Apr. 1, 2026).

13. Its principal place of business in the United States is One World Trade Center, 71st Floor, Suite J, New York, NY 10007, and Defendant accepts service in the United States through its subsidiary Intercept Interactive Inc. d/b/a Perion. *Annual and transition report of foreign private issuers – 2025 FY*, PERION (Mar. 16, 2026), https://perion.com/investors/financial-results/.

14. Perion wholly owns, directly or indirectly, all of its subsidiaries including Codefuel Ltd.; IncrediMail, Inc.; Intercept Interactive, Inc.; Vidazoo Ltd.; Hivestack Technologies Inc.; and Greenbids SAS. *See id.*

15. Defendant operates its subsidiaries and affiliates in a unified manner through its platform entitled "Perion One." Perion One is "designed to unify [the] diverse advertising channels, brands, and technologies into a single, advanced AI-native execution infrastructure. Perion One is intended to eliminate industry silos, enhance operational efficiency, and provide advertisers with a seamless way to execute and optimize cross-channel campaigns." *Id.*

16. Embedded directly within Perion One is Defendant's proprietary AI—Outmax, which is based on technology that Defendant acquired from Greenbids SAS. Defendant's AI "operates across several major social platforms, Open Web, major [Demand Side Platforms], and [premium streaming channels, such as Hulu, HBO Max, Disney+, and DirecTV]." *Id.*

17. Outmax even allows Defendant to circumvent walled gardens, such as Meta, TikTok, and Youtube, where advertisers have limited access to user data and restricted control over metrics. *Id.*

18. For open web advertising, Perion One "renders and customizes visually striking ad formats across desktop and mobile devices based on real-time data points. This suite also incorporates innovative features such as [Defendant's] in-ad AI Chatbot, which enables consumers to interact dynamically with advertisers in real time, driving deeper user engagement and stronger brand connection." *Id.*

19. "Perion does not have a direct relationship with the End Users and processes personal data automatically through the Offering. By means of example, if an individual is browsing a website which embeds the Perion proprietary multi-screen video player technology, Perion will collect information about such individual's interaction with the website and player." *Perion Offering Privacy Policy*, PERION (May 7, 2025), https://perion.com/perion-offering-privacy-policy/.

20. Defendant collects the following data points about internet users without their knowledge: the type of browser or device, language preference, time and date stamp, country location, mobile advertising ID (MAID), IP address, hashed emails, agent, unique identifier provided by a third party, cookie ID, IDFA, advertising ID, bid request identifier, affiliate ID, installation ID, any other ID automatically collected by Perion One, click stream data (whether an ad was clicked), event data (whether an ad was viewed, or an event occurred, such as installing an app), web pages visited, or applications used, content viewed, the referred URL, the current URL, search terms, gender, age range, interests (such as sports or animals), and health-related information. *Id.*

21. Every internet user who interacts with any website using Defendant's technology ("End User") is assigned a unique identifier entitled "Unified ID." Defendant and its third-party partners use the Unified ID combined with information collected about users' "visits to [Defendant's] and other websites, mobile websites and/or mobile applications across [users] various devices, in order to match those devices together by creating a profile revealing likely associations of, or connections between, them. That profile is used to determine that [a user is] likely to be the same user visiting the websites or applications on different devices, and to provide more tailored

advertising, marketing, measurement, analytics, and research about goods and services of interest to [users] across those various devices." *Id.*

22. Perion compiles and graphs all of this data using "persistent IDs" which "aren't tied to ephemeral cookies. They survive changes in browsers logouts, and cross-device shifts" so "advertisers maintain customer profiles over time [and] track long-term engagement patterns." *A Guide to Identity and Data Resolution in Advertising*, PERION (Feb. 16, 2026) https://perion.com/glossary/identity-data-resolution-2/ .

23. In addition to collecting online information, Defendant collects real-world, offline PII through its digital-out-of-home ("DOOH") advertising services within its Perion One offering. *Discovery,* Perion, https://dooh-inventory.perion.com/?countries=United%20States (last accessed Apr. 24, 2026).

24. For example, Defendant boasts over 1 trillion monthly impressions from its DOOH inventory of 660,000 screens across the United States. *Id.*

25. Defendant sells and/or shares the information it collects about users with mobile app publishers, smart TV app publishers, channels, players, websites, social media companies, DOOH advertisers, brands, networks, and data exchange platforms. *Id.*

26. In 2024, Defendant's revenue, gained through selling PII and user profiles, was nearly half a billion dollars. *Annual and transition report of foreign private issuers – 2025 FY*, PERION (Mar. 16, 2026), https://perion.com/investors/financial-results/.

## JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed Classes are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed Classes is a citizen of a state different from Defendant.

28. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges questions of federal law under the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2511, *et seq.*).

29. This Court has personal jurisdiction over Defendant because Defendant purposefully directed its data-collection and monetization activities at California residents, and Plaintiffs' claims arise out of and relate to those California-directed contacts. These contacts are deliberate, not incidental.

30. As alleged herein, Perion's own privacy disclosures establish that it collects and derives users' location from their IP addresses, including general geographic location (such as city, state, and country) and, in connection with certain campaigns, precise location data. Perion therefore knows, either before or shortly after its tracking technologies begin collecting a user's communications, when it is collecting the communications of a California resident. Each such identification of a California user is a purposeful contact with California, and is not the product of mere happenstance.

31. Perion derives a direct financial benefit from identifying and tracking California users. Advertisers pay for the ability to reach audiences in defined geographic markets, and California, the most populous state in the country, is among the most valuable. When Perion identifies a user as a California resident through IP-based geolocation and incorporates that user into the identity profiles and audience segments it sells, it monetizes that California-specific information. Perion's contacts with California thus generate revenue, rather than merely incidental data.

32. Perion also maintains a continuous and systematic operational presence in California that reinforces these contacts, including: an office in Los Angeles; its subsidiary Hivestack, Inc.'s registration as a data broker with the California Attorney General; and its history of California-directed transactions, including its 2014 acquisition of San Francisco-based Grow Mobile.

33. This Court has personal jurisdiction over Defendant because it operates, conducts, engages in, or carries on a business throughout California. Defendant is registered to do business in the State of California. Furthermore, Plaintiff's claims arise from Defendant's conduct in California.

34. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District and Plaintiff reside in this District. Further, Defendant regularly conducts business and markets to customers throughout California.

## FACTUAL BACKGROUND

### A. Cookies and Trackers Surreptitiously Share Patients' Communications and Unique Identifiers with Third Parties

35. Visiting a website involves a series of electronic communications between the visitor's browser and the website's servers. When a person visits a website, their browser initiates a series of web requests to Defendant's servers, requesting the webpage and associated resources. These are typically styled as HTTP "GET" requests. As the visitor's browser processes the webpage, additional requests may be triggered by scripts embedded within the webpage. These scripts are instructions sent by the webpage to the visitor's browser, which the visitor's browser then executes.

36. A visitor's interactions with a website may also involve HTTP "POST" requests. In a typical POST request, the visitor's browser sends information to the website's server.

37. "Trackers" (or "tracking technologies") are one type of script that may be embedded within a webpage delivered in response to a "GET" request. Trackers instruct a visitor's browser to send information about the visitor's browsing activity to the tracker's developer. Tracked browsing information may include words typed, links clicked, full URL's, time spent on each page, and buttons clicked by the visitor. This browsing information is typically accompanied by one or more data points that uniquely identify the visitor, such as their IP address or a "cookie."

38. "Cookies" are small text files sent by a website server to a visitor's browser and stored locally on the visitor's device. Typically, cookies contain a unique identifier tied to a specific visitor. When a visitor's browser sends an HTTP request to a website server, the request includes the cookie or cookies that allow the server to identify the visitor.

39. When a visitor accesses a webpage containing third-party trackers and cookies, the trackers instantaneously intercept and duplicate communications sent between the visitor's browser and the website's server. Duplicated communications include the HTTP "GET" requests through which the visitor's browser requests the webpage and related resources, as well as the HTTP "POST" requests.

40. Thus, while it appears to the visitor that their browser is communicating only with the owner of a specific website, in fact their communications are intercepted and shared in real-time with undisclosed third parties.

41. Here, while visitors of a website that is embedded with Perion cookies and trackers believe they are communicating only with the website owner, in fact their communications are intercepted and shared in real-time with Perion.

42. Third-party trackers and cookies represent an invasion of privacy. Indeed, 62% of respondents in a recent survey of North American consumers stated that they were uncomfortable with online tracking, with 19% of respondents feeling "completely violated" by online tracking.[1]

43. When third-party trackers and cookies are present on consumer-facing websites, information that consumers expect to remain private between themselves and the website's owner is surreptitiously intercepted and shared with undisclosed third parties such as Perion.

**B. The Backroom RTB Industry for Online Advertising.**

44. "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application. It happens 178 trillion times every year across the U.S. and Europe." Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

45. "When users go to a website or mobile app, a real-time auction is conducted where advertisers bid and compete for an ad space. If the advertiser has the highest bid in the auction, their ad is displayed on a publisher's website or mobile app." *What is Real-Time Bidding (RTB)? Definition and Importance*, AMAZON, https://advertising.amazon.com/library/guides/real-time-bidding (last accessed Apr. 6, 2026).

46. Within this economy are different entities that rely on End Users' PII to maximize their revenue: 1) publishers; 2) advertisers; 3) supply side platforms ("SSP"); 4) demand side

[1] *Nearly 80% of Consumers Favor Brand Transparency of Personal Data Use in Digital Advertising*, GumGum (Mar. 19, 2025), https://gumgum.com/press-releases/na-digital-advertising-pulse-check-3.

platforms ("DSP"); and 5) ad exchanges. Many technology companies, including Perion, wear numerous hats in this infrastructure.

47. A publisher is "[a] company, website, or entity that owns and offers digital content, generating revenue by selling ad inventory to agencies and advertisers." *Publisher,* PERION (July 4, 2024), https://perion.com/glossary/publisher/.

48. Advertisers are individuals, companies, or organizations "that create[] and fund[] advertisements to promote products, services, or ideas." *Advertiser*, PERION (July 1, 2024), https://perion.com/glossary/advertiser/.

49. SSPs are "technology company[ies] that enable[] publishers to manage and automate the selling of their ad inventory, allowing them to generate the maximum revenue per ad impression." *Supply Side Platform (SSP)*, PERION (July 4, 2024), https://perion.com/glossary/supply-side-platform-ssp/.

50. DSPs are "software solution[s] that allows advertisers, agencies, and brands to purchase digital ad inventory across multiple publisher sites through a single interface. Rather than negotiating ad placements manually, DSPs use [RTB] and data-driven custom [algorithms] to automate the process of buying digital ads." *Demand Side Platform (DSP)*, PERION (July 1, 2024), https://perion.com/glossary/demand-side-platform-dsp/.

51. "DSPs automate buying across multiple ad formats, display, video, mobile, and more, while leveraging behavioral and contextual data for precise targeting." *Id.*

52. "When an [ad] impression becomes available, the DSP evaluates it based on the advertiser's targeting criteria, campaign goals, and budget. If the impression aligns with the campaign parameters, the DSP places a bid in real time." *Id.*

53. "Advertisers turn to DSPs when they need to run scalable, data-driven campaigns across multiple channels and devices. Whether the goal is brand awareness or performance marketing, DSPs provide the tools to reach audiences based on behavioral signals, location data, or demographic profiles." *Id.*

54. In sum, DSPs operate using all available data about users to rapidly purchase online advertising space:




55. Ad exchanges are "digital marketplace[s] where ad space is bought and sold." *Ad Exchange*, PERION (July 1, 2024), https://perion.com/glossary/ad-exchange/.

56. "When a user visits a publisher's website or an application, a piece of code installed on the site sends a page request, to upload content to the page. At the same time, the server sends an ad request to fill the ad slots on the page. This request makes this specific ad inventory available and allows them to buy it. The ad exchange promotes the ad space to advertisers, according to the publisher's criteria—such as geotargeting, approved advertisers, and frequency capping—and lets them bid for the impression." *Id.*




57. The highest bidder in the ad exchange wins that ad space and their ad is immediately displayed to the user via the ad server. *Id.*

58. Perion offers a DSP, SSP, and ad server as part of its "overall advertising technology solutions." *Demand Side Platform (DSP)*, PERION (July 1, 2024), https://perion.com/glossary/demand-side-platform-dsp/.

**C. The Online PII Feeding the RTB Industry.**

59. "Cybersecurity experts estimate that data brokers collect an average of 1,000 data points on each individual with an online presence." Barbara Booth, *What internet data brokers have on you – and how you can start to get it back*, CNBC (Oct. 11, 2024), https://www.cnbc.com/2024/10/11/internet-data-brokers-online-privacy-personal-information.html.

60. For example, data brokers collect "name, address, telephone number, e-mail address, gender, age, marital status, children, education, profession, income, political preferences, [] cars and real estate ownership[,] health information, the sites we visit online, which products we buy, how we pay, [] the advertisements we click on […] and [] real-time location data." *Data Brokers*, ELECTRONIC PRIVACY INFORMATION CENTER, https://epic.org/issues/consumer-privacy/data-brokers/ (last accessed Mar. 25, 2026).

61. Data brokers also use device fingerprinting to link users to specific devices to track users regardless of changes to their IP address, cleared browser history, or use of private browsing

modes. Nico Latto, *Data Brokers: Everything You Need to Know*, AVAST (Jan. 3, 2024), https://www.avast.com/c-data-brokers.

62. To create a device fingerprint, data brokers collect "Browser version and configuration[;] Operating system and device type[;] Screen resolution and system fonts [;] Installed plugins and extensions [;] Time zone and language settings [and] Network configurations and protocols used." *Digital Fingerprinting in Cybersecurity*, BITSIGHT (Updated Jan. 14, 2026), https://www.bitsight.com/learn/cti/digital-fingerprinting.

63. Combining the device fingerprint with information gathered through cookies, data brokers are able to create a complete profile of every internet user. *See* Nico Latto, *What Is Browser Fingerprinting and How Can You Prevent It*, AVAST (Oct. 22, 2022), https://www.avast.com/c-what-is-browser-fingerprinting.

64. "Data brokers collect so much data because your data is extremely valuable!" *Data Brokers: What They Are, How They Work, And How You Can Protect Your Privacy*, NATIONAL CYBERSECURITY ALLIANCE (Jan. 20, 2026), https://www.staysafeonline.org/articles/data-brokers-what-they-are-how-they-work-and-how-you-can-protect-your-privacy.

65. In 2022, Business News Daily reported that some businesses collect personal data (i.e., gender, web browser cookies, IP addresses, and device IDs), engagement data (i.e., how consumers interact with a business's website, applications, and emails), behavioral data (i.e. customers' purchase histories and product usage information), and attitudinal data (i.e., data on consumer satisfaction) from consumers. This information is valuable to companies because they can use this data to improve customer experiences, refine their marketing strategies, capture data to sell it, and even to secure more sensitive consumer data. Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, BUSINESS NEWS DAILY (Oct. 20, 2023), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html.

66. In a consumer-driven world, the ability to capture and use customer data to shape products, solutions, and the buying experience is critically important to a business's success. Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin." Brad Brown, et al, *Capturing*

*value from your customer data*, McKinsey & Company (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.

67. In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value." In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses." *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digit. Econ. Papers, No. 220 (Apr. 2, 2013), at https://www.oecd.org/content/dam/oecd/en/publications/reports/2013/04/exploring-the-economics-of-personal-data_g17a228d/5k486qtxldmq-en.pdf.

68. OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e., $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military are estimated to cost USD 55." *Id.*

69. Defendant registered its subsidiary Hivestack as a data broker in California. *Data Broker Registration for Hivestack, Inc.*, Office of the Attorney General, https://oag.ca.gov/data-broker/registration/560365 (last accessed Apr. 20, 2026). Defendant's "Undertone" trackers appear on over 24,000 websites, with the majority being within the top 500,000 most popular websites visited such as Ambetter Health; Women's Health Magazine; Farmers Insurance; Business Insider; Eating Well; Autism Partnership Foundation; Fox Business; HuffPost; Money Digest; Tumblr; Newsweek; and Vanguard Mutual Funds, among thousands of others.

70. Undertone uses its "Synchronized Digital Branding combines data, distribution and creative to deliver cohesive stories across all critical touchpoints: screens, platforms and a transparent, customizable list of elite publishers. The AI-driven platform eliminates fragmentation, delivers much-needed revenue for publishers and, most importantly, ensures brand messaging is contextually relevant. Undertone creates stunning campaigns that align with KPIs—always with

beautiful creative and in brand-safe environments." *Undertone Online Ads Actually More Effective than Multi-Million Dollar Super Bowl TV Ad Campaigns*, PERION (Feb. 14, 2019), https://perion.com/press/undertone-online-ads-actually-more-effective-than-multi-million-dollar-super-bowl-tv-ad-campaigns/.

71. Defendant uses Undertone and other cookies to collect PII about Plaintiffs and the Classes and links that data to their Unified IDs for each internet user.

72. For example, Undertone and other cookies and trackers collects a user's IP address, browser types, operating systems, domain names, access dates and times and app interaction, referring website addresses, online transactions, browsing and search activity, device IDs and network type and service provider.

**D. The Real-World PII Feeding the RTB Industry**

73. In addition to using PII harvested from the Internet, the RTB industry also relies on PII collected from End Users' interactions with DOOH advertising.

**74.** DOOH advertising can be found "**in public spaces, such as digital billboards, transit hubs, retail locations, and kiosks.** This type of media goes a step forward from static signage by featuring dynamic and contextual messaging that can be updated in real time." *Digital Out of Home (DOOH)*, PERION (July 1, 2024), https://perion.com/glossary/digital-out-of-home-dooh/ (original emphasis).

75. DOOH works by offering "a programmatic stack that integrates demand-side platforms (DSPs), supply-side platforms (SSPs), and ad servers optimized to work in real-time. For example, Perion's platform enables advertisers to plan, activate, and measure DOOH campaigns, and publishers to monetize their inventory with full creative control." *Id.* (emphasis removed).

76. Defendant's DOOH services collects purportedly anonymized mobile data of End Users "to quantify campaign efficacy." *Id.*

77. Defendant's services allow marketers to "[l]everage a vast array of audience and location data to create custom audience segments and activate screens with a high propensity to overlap with their journeys." *Digital Out-of-Home*, PERION, https://perion.com/dooh/ (last accessed Apr. 24, 2026)

78. Defendant allows third parties to trigger ads to display to End Users, as they conduct their ordinary lives in their hometowns, based on proximity geofencing, contextual targeting, demographic audiences, pre-defined audiences, custom audiences, and cross-screen retargeting.

79. Cross-screen retargeting allows marketers to "provid[e] relevant ads wherever [End Users] are, online or offline" as demonstrated as follows:




*Id.*

80. Proximity geofencing, or proximity targeting, means "[t]argeting customers in real-time based on their current location using GPS and mobile network triangulation to determine a user's location and proximity to a reference point. [For example, t]his enables users entering a defined geographic area, such as a mall or a retail store, to receive push notifications on their smartphones." *Proximity Targeting*, PERION (July 4, 2024), https://perion.com/glossary/proximity-targeting/.

81. As demonstrated, Defendant also feeds the PII it collects via DOOH advertising into its End User profiles to expand the data available to third parties to buy and use for targeted, online advertising.

**E. How Perion's Tracking Technologies Intercept Users' Communications**

82. Defendant uses Undertone, Vidazoo, and other tracking technologies to collect PII about Plaintiffs and the Classes and links that data to their Unified IDs for each internet user.

83. For example, these tracking technologies collect a user's IP address, browser types, operating systems, domain names, access dates and times and app interaction, referring website addresses, online transactions, browsing and search activity, device IDs and network type and service provider.

**i. The Undertone Tracker**

84. Undertone is one of Perion's tracking technologies. Third-party website operators implement the Undertone tracker in the code of their websites, where it enables Perion to collect data about those websites' users. Undertone appears on over 24,000 websites, with the majority being within the top 500,000 most popular websites visited such as Ambetter Health; Women's Health Magazine; Farmers Insurance; Business Insider; Eating Well; Autism Partnership Foundation; Fox Business; HuffPost; Money Digest; Tumblr; Newsweek; and Vanguard Mutual Funds, among thousands of others.

85. When a user's browser loads a page containing the Undertone tracker, the tracker loads automatically and executes in the background, without any visible indication to the user, and causes the browser to open a connection to Undertone's server at hb.undertone.com. Through that connection, the Undertone tracker transmits to Perion, in real time and while the user's communication with the website is still in transit, the contents of the user's communication, including the URL of the page being viewed and the user's search terms and selections, together with the user's IP address, the user's device and browser characteristics, and the persistent identifier described below. Only a user with technical knowledge who deliberately inspects the page's source code or network traffic could detect that these communications are being transmitted to Perion.

86. Undertone uses its "Synchronized Digital Branding combines data, distribution and creative to deliver cohesive stories across all critical touchpoints: screens, platforms and a transparent, customizable list of elite publishers. The AI-driven platform eliminates fragmentation, delivers much-needed revenue for publishers and, most importantly, ensures brand messaging is contextually relevant. Undertone creates stunning campaigns that align with KPIs—always with beautiful creative and in brand-safe environments." *Undertone Online Ads Actually More Effective than Multi-Million Dollar Super Bowl TV Ad Campaigns*, PERION (Feb. 14, 2019),

https://perion.com/press/undertone-online-ads-actually-more-effective-than-multi-million-dollar-super-bowl-tv-ad-campaigns/.

87. The Undertone tracker sets and reads a persistent cookie on the user's device, known as the UTID, or Undertone ID. The UTID is a string of characters that is unique to the user's browser or device and that functions as a persistent pseudonymous identifier, allowing Perion to recognize the same user or device across the many websites on which the Undertone tracker operates. As alleged above, Perion links the UTID, together with the other information that the Undertone tracker collects, to the Unified ID that Perion maintains for each internet user. Perion's own disclosures describe the UTID as a marketing cookie that is used to "track visitors across websites" so that the advertising displayed is "relevant and engaging for the individual user."

88. The Undertone tracker also collects the user's IP address, which the user's browser transmits to hb.undertone.com each time it connects. An IP address is a globally unique numerical identifier that guides or routes communications across the internet, in the same way that a telephone number routes a call to the correct household. Internet service providers assign IP addresses to networking devices such as modems or routers. Because an IP address is exchanged at the network level in order to route a communication, it is visible to the receiving server even where it does not appear in the application-layer data shown by standard browser tools.

89. IP addresses reveal the general geographic location of internet users. Free online IP-lookup services use databases that map IP addresses to geographic areas, and in some cases to specific households, often providing the country, city, county, approximate coordinates, or internet service provider associated with the address. This geolocation capability makes IP addresses valuable for digital advertising and tracking, allowing companies to target advertisements to users in specific geographic areas and to track user interactions across multiple websites.

90. The IP address is particularly powerful when combined with a persistent identifier such as the UTID cookie. When an individual uses a device in different locations, such as home and work, each location has its own IP address. By correlating these changing IP addresses with the persistent UTID, Perion can build a detailed profile of an individual user's routines and movements

that distinguishes that user from others who may share the same network, and can identify and track that user with precision even when several people share the same household or workplace network.

91. For these reasons, the European Union's General Data Protection Regulation classifies IP addresses as personal data, recognizing that information that has been de-identified or pseudonymized, but that can be used to re-identify a person, remains personal data. When Perion combines the IP address with the UTID and the browsing activity that the Undertone tracker intercepts, including the user's search terms and the health-related, religious, and political content of the pages the user views, it is able to assemble a comprehensive digital profile capable of identifying specific individuals and their most sensitive interests.

92. The Undertone tracker records and transmits routing, addressing, and signaling information that is used to direct and identify the user's communications, including the user's IP address, the persistent UTID identifier described above, and the addresses of the web pages that the user's browser requests. By recording and transmitting this addressing and signaling information, the Undertone tracker functions as a pen register.

93. The addresses, or URLs, that the Undertone tracker captures also frequently contain the contents of the user's communications. A URL often embeds the search terms or other text that the user enters, and the path of a URL often reveals the specific page, article, or subject matter that the user has chosen to view. As the examples below illustrate, the Undertone tracker therefore captures not only addressing and signaling information but also the contents of users' communications, including their search queries and the particular health-related, religious, and political material that they seek.

**ii. The Vidazoo Tracker**

94. Perion uses a second tracking technology through its subsidiary Vidazoo. Like the Undertone tracker, the Vidazoo tracker is implemented in the code of third-party websites, where it loads automatically and invisibly, and causes the user's browser to open a connection, in this instance to Vidazoo's server at exchange.cootlogix.com, through which it transmits the contents of the user's communications and the user's IP address to Perion in real time. Public domain-name records

associate exchange.cootlogix.com with Vidazoo's infrastructure through an alias to Vidazoo-controlled hostnames.

95. The Vidazoo tracker sets a persistent cookie on the user's device, identified as vdz_sync, that uniquely identifies the user's browser or device and serves the same identifying and tracking function as the UTID cookie set by the Undertone tracker.

96. Like the Undertone tracker, and for the same reasons, the Vidazoo tracker records and transmits routing, addressing, and signaling information, including the user's IP address and the addresses of the web pages that the user's browser requests, and therefore also functions as a pen register.

97. The Vidazoo tracker also engages in a process known as identity syncing. After the user's browser receives the vdz_sync identifier, the Vidazoo tracker causes the browser to send additional requests that transmit that identifier to third-party advertising partners, including Smaato, Adform, and Xandr. Each partner that receives the vdz_sync identifier records a correspondence between Perion's identifier for the user and the partner's own identifier for the same user, so that the two companies can thereafter recognize that they are referring to the same person.

98. Identity syncing is significant because it defeats the technical separation that would otherwise limit the reach of each company's tracking. A cookie set by one company can ordinarily be read only by that company, which on its own would confine each tracker to the data that it alone collects. Identity syncing removes that limitation: by matching their respective identifiers for the same user, Perion and its partners can link and combine the separate profiles that each of them has assembled, merging data collected across different websites and by different companies into a single, more complete profile of the individual. Identity syncing also allows a user to be recognized across different websites, browsers, devices, and platforms, and to be re-identified even after the user clears cookies or a cookie expires, because a synced partner can supply the identifier again. And it multiplies the number of companies that receive and retain a user's information, including many companies that the user has never heard of and with which the user has never knowingly interacted.

### iii. Perion's Trackers Feed Users' Communications Into the Real-Time Bidding Process

99. The interceptions described above do not occur in isolation. As alleged above, Perion operates a supply-side platform, a demand-side platform, and an ad server, and participates in the real-time bidding industry. The Undertone and Vidazoo trackers are a means by which Perion obtains the user data that powers that business. The information that the trackers transmit to Perion, including the user's IP address, the user's location, the contents of the pages the user views, the user's search terms, and Perion's persistent identifiers, is the same category of information that is used to value and target advertising in real-time bidding auctions.

100. In the real-time bidding process described above, when a user loads a page on a website that participates in that process, information about the user and the user's visit is placed into a bid request and transmitted to the participants invited to bid on the advertising space, which can include numerous demand-side platforms, advertisers, data brokers, and other intermediaries. Identity syncing is what allows those participants to recognize the user described in a bid request as a person for whom they already hold a profile, to bid accordingly, and to append the new information to that profile. Participants that receive a bid request may retain the personal information that it contains even when they do not submit the winning bid and never serve the user an advertisement. As a result, a single visit to a single web page can cause a user's information, including the sensitive health-related, religious, and political activity described above, to be disseminated to and retained by a large number of companies, linked to a persistent identity, and all without the user's knowledge

101. The following examples, drawn from Plaintiffs' pre-suit investigation, illustrate how the Undertone and Vidazoo trackers intercept users' communications on websites that have implemented them, including websites that Plaintiffs visited. In each example, when a user loads a page or enters a search, the user's communication with the website is transmitted to Perion in real time, together with the user's IP address and Perion's persistent identifier.

102. The website tdeecalculator.net is a free health-and-fitness tool that estimates a user's total daily energy expenditure based on personal inputs, including the user's age, sex, height, weight, and activity level. When a user enters this information, for example, a fifty-year-old male who is

five feet nine inches tall, weighs 180 pounds, and reports a sedentary activity level, that information is transmitted to Perion through the Vidazoo tracker by means of a request to exchange.cootlogix.com, together with the address of the page, the user's IP address, and the vdz_sync identifier. This transmission occurs in real time, automatically, and invisibly to the user, while the user's communication with the website is still in transit.

103. The website blackdoctor.org is a health-and-wellness website that provides health information and related resources. When a user selects "Clinical Trials" from the website's homepage, that interaction is transmitted to Perion through the Undertone tracker, together with the UTID cookie. Likewise, each term that a user enters into the website's search bar is transmitted through the Undertone tracker in the same manner. For example, when a user searches for "psychiatrist," that search term is transmitted to Perion through the Undertone tracker.

104. The website mediaite.com is a news and commentary website that covers media, politics, and current events. When a user selects "Politics" from the website's homepage, that interaction is transmitted to Perion through the Undertone tracker, together with the UTID cookie.

105. The website biblegateway.com is an online Bible reference and study platform. When a user selects "Faith and Doubt" under the website's "Biblical Living" category, that interaction is transmitted to Perion through the Undertone tracker, together with the UTID cookie. Likewise, each term that a user enters into the website's search bar is transmitted through the Undertone tracker in the same manner. For example, when a user searches for "adultery," that search term is transmitted to Perion through the Undertone tracker.

**F. End Users Have a Reasonable Expectation of Privacy in Their PII.**

106. Consumers are skeptical and wary about their data being collected. A report released by KPMG shows that "a full 86% of the respondents said they feel a growing concern about data privacy, while 78% expressed fears about the amount of data being collected." CORPORATE DATA RESPONSIBILITY: BRIDGING THE CONSUMER TRUST GAP, 1 (KPMG, Aug. 2021)

107. Privacy polls and studies show that a majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data. *See e.g.,* Venky Anant, et al., *The consumer-data opportunity*

*and the privacy imperative*, McKinsey & Company (Apr. 27, 2020), https://www.mckinsey.com/capabilities/risk-and-resilience/our-insights/the-consumer-data-opportunity-and-the-privacy-imperative; *Global Trust in Digital Services Declines, finds Thales*, Thales (Mar. 18, 2025), https://cpl.thalesgroup.com/about-us/newsroom/digital-trust-index-2025.

108. A recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them. *See Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/.

109. Moreover, according to a study by Pew Research Center, a significant majority of Americans, approximately 79%, are concerned about how data is collected about them by companies. *See* Brooke Auxier, et al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, Pew Research Center (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-concerned-feel-lack-of-control-over-personal-data-collected-by-both-companies-and-the-government/.

110. Users act consistently with their expectation of privacy. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85% of worldwide users and 94% of U.S. users chose not to allow such tracking. Margaret Taylor, *How Apple screwed Facebook*, Wired (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

111. "When individuals interact with a business online, they reasonably expect that their data will be collected and used for the limited purpose and duration necessary to provide the goods or services that they requested." *Data Minimization*, Electronic Privacy Information Center, https://epic.org/issues/consumer-privacy/data-minimization/.

112. In fact, Defendant intercepts the communications and data of website visitors without their consent and in a context for which consent could not even be achieved. There is no direct

relationship between Defendant and Plaintiffs or Class members. There is no reasonable basis for Plaintiffs and Class Members to know or even be able to conceptualize the extent and scale of Defendant's practice of tracking and intercepting their data through countless websites using persistent tracking technologies; buying and selling their data to and from countless other data brokers and advertisers in a massive and complex data marketplace that operates completely out-of-sight; and compiling extremely detailed and permanent profiles that resolve their identities as well as contain virtually everything there is to know about them, including activities engaged in, interests, religious and political beliefs, habits, modes of living, location and contact information, and the specific devices they use. Plaintiffs and Class members also have no way to know how their comprehensive profiles will be used, shared and sold or which other third parties will access them and for what purpose. Not only does Defendant not even attempt to ask for consent from Plaintiff or Class members for any facet of its practices, it is also not disclosing the identities or intent of all of the other data dealers that Defendant is partnering with as part of its practice. The result, and the current status quo, is that consumers are forced to live under a massive and secret commercial surveillance environment at the hands of data brokers such as Perion without any guardrails whatsoever to protect consumers and their privacy.

## **TOLLING, CONCEALMENT, AND ESTOPPEL**

113. The applicable statutes of limitation have been tolled because of Defendant's knowing and active concealment and denial of the facts alleged herein.

114. Defendant actively concealed its use of cookies and trackers by failing to provide notice of the existence of its cookies and trackers embedded on websites as well as the full scale and extent of its practices with regards to use and selling of the data of Plaintiffs and the Class members.

115. Plaintiffs and putative Class members could not have discovered Defendant's conduct as Defendant's practices operate entirely in the dark, under the hood of websites, and in secret data marketplaces outside of the view and awareness of Plaintiffs and Class members.

116. All applicable statutes of limitation have also been tolled by operation of the discovery rule as well as the doctrine of continuing tort. Defendant's illegal interception, sharing, enhancing, and selling of Plaintiffs' and the Class's communications and data has continued unabated. Further,

Defendant was under a duty to disclose the nature and significance of its data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

**CLASS ALLEGATIONS**

117. Plaintiffs seek to represent a Nationwide Class of similarly situated individuals based on the following definition, subject to modification as appropriate:

> All natural persons in the United States whose PII was collected, sold, or used by Defendant in the process of delivering targeted advertisements on websites, mobile applications, and other digital media.

118. Plaintiffs also seek to represent a California Class of similarly situated individuals based on the following definition, subject to modification as appropriate:

> All California residents whose PII was collected, sold, or used by Defendant in the process of delivering targeted advertisements on websites, mobile applications, and other digital media.

119. The Nationwide Class and California Class shall be collectively referred to as the Classes.

120. Excluded from the Classes are Defendant, as well as its officers, employees, agents or affiliates, as well as all past and present employees, officers and directors of its subsidiaries and/or affiliates, and any judge who presides over this action.

121. Plaintiffs reserve the right to expand, limit, modify, or amend the definition of the Classes, including the addition of one or more subclasses, in connection with their motion for class certification, or at any other time, based upon, inter alia, changing circumstances and/or new facts obtained during discovery.

122. This action is brought and may properly be maintained as a class action pursuant to Federal Rule of Civil Procedure 23. This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements.

123. <u>Numerosity</u>: The members of the Classes are so numerous that joinder of all members is impracticable. Plaintiffs are informed and believes that the proposed Classes contains thousands of individuals who have been damaged by Defendant’s conduct as alleged herein. The precise number of members of the Classes is unknown to Plaintiffs.

124. Existence and Predominance of Common Questions of Law and Fact: This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes. These common legal and factual questions include, but are not limited to, the following:

a. whether Defendant's acts and practices complained of herein amount to egregious breaches of social norms;

b. whether Defendant acted intentionally in violating Plaintiffs and the Classes' privacy rights;

c. whether Defendant was unjustly enriched as a result of its conduct as alleged herein; and

d. whether Plaintiffs and the Classes are entitled to equitable relief, actual, statutory, punitive, or other forms of damages, and any other monetary relief.

125. Typicality: Plaintiffs' claims are typical of the claims of the Classes because they arise out of the same wrongful business practice of Defendant as described above.

126. Adequacy: Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs is an adequate representative in that she visited websites that employed Defendant's cookies or other targeted ad services, her PII was collected, and Defendant used, analyzed, and sold Plaintiffs' PII. Additionally, Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no antagonistic or adverse interest to those of the Classes.

127. Superiority: The nature of this action and the nature of laws available to Plaintiffs and the Classes make the use of the class action format a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the Classes for the wrongs alleged. The damages or other financial detriment suffered by individual members of the Classes is relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for Plaintiffs and Classes, on an individual basis, to obtain effective redress for the wrongs done to them. Absent the class action, Plaintiffs and the

Classes would not likely recover or have the chance to recover damages or restitution; thus, Defendant will be permitted to retain the proceeds of its misdeeds.

128. Members of the Classes may be identified and ascertained through Defendant's records of users via their Unified ID.

## FIRST CAUSE OF ACTION
**Violation of California Penal Code § 631**

129. Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

130. Plaintiffs bring this claim individually and on behalf of the California Class against Defendant.

131. The California Invasion of Privacy Act is codified at Cal. Penal Code §§ 630 to 638. The Act begins with its statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

132. California Penal Code section 631(a) provides in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500)

133. Plaintiffs and the California Class did not consent to Defendant's use of the Perion One offering to collect, use, and sell their PII nor to Defendant tracking Plaintiffs and the California Class across the internet to create detailed End User profiles.

134. Defendant is not a party to the communications because its technology is embedded on the websites that End Users interact with rather than directly operating each website utilizing its Perion One services.

135. Defendant's Perion One offering, including its Undertone and Vidazoo trackers and other tracking technologies, are machines, instruments, or contrivances that read and learn the contents of Plaintiffs' and the California Class's communications with website operators, including their PII, while these End Users use the internet in California.

136. Defendant willfully read, attempted to read, and learned the contents of Plaintiffs' and the California Class's electronic communications with websites while those communications were being transmitted in real-time to the website operator.

137. Defendant sold the collected PII to third parties and/or used the PII to create cradle-to-grave End User profiles, which were also sold to third parties. Defendant aids the third parties by not only selling the PII and/or End User profiles but also providing identity resolution of End Users through the Unified ID.

138. Plaintiffs and the California Class have suffered loss because of these violations, including but not limited to, violation of their rights to privacy and loss of value of the PII.

139. Pursuant to California Penal Code § 637.2 and Plaintiffs' and the California Class's injury by Defendant's violations of California Penal Code § 631, Plaintiffs and the California Class seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

## SECOND CAUSE OF ACTION
## Violation of California Penal Code § 638.51

140. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 to 124 as if fully set forth herein.

141. Plaintiffs bring this claim individually and on behalf of the California Class against Defendant.

142. California Penal Code Section 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by

an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

143. California Penal Code Section 638.51 prohibits any person from using a pen register without a court order.

144. Defendant's tracking technologies within its Perion One offering, such as its Undertone and Vidazoo trackers, constitute "pen registers" because they are devices or processes that record addressing or signaling information—Plaintiffs' and the California Class's PII—from the electronic communications they transmit to websites, or DOOH advertising utilizing Defendant's tracking technologies.

145. Specifically, Defendant's Perion One offering collected details about End Users', including Plaintiffs' and the California Class's, the type of browser or device, language preference, time and date stamp, country location, mobile advertising ID (MAID), IP address, hashed emails, agent, unique identifier provided by a third party, cookie ID, IDFA, advertising ID, bid request identifier, affiliate ID, installation ID, any other ID automatically collected by Perion One, click stream data (whether an ad was clicked), event data (whether an ad was viewed, or an event occurred, such as installing an app), web pages visited, or applications used, content viewed, the referred URL, the current URL, search terms, gender, age range, interests (such as sports or animals), and health-related information.

146. Defendant was not authorized by a court order to use a pen register to collect Plaintiffs' and the California Class's PII.

147. At all relevant times, Defendant's recorded Plaintiffs' and the California Class's PII via the Perion One offering without consent.

148. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and the California Class seek injunctive relief and statutory damages in the amount of $5,000 per violation.

## <u>THIRD CAUSE OF ACTION</u>
## Invasion of Privacy – Intrusion Upon Seclusion

149. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 to 174 as if fully set forth herein.

150. Plaintiffs bring this claim individually and on behalf of the California Class against Defendant.

151. California's Constitution contains a right to privacy that creates a right of action against private entities such as Defendant. The principal purpose behind California's constitutional right to privacy was to protect against unnecessary information gathering, use, and dissemination by entities such as Defendant.

152. As described herein, Defendant has intruded upon the legally protected privacy interests of Plaintiffs and the California Class, including at least the following:

a. the privacy interests created by California's Invasion of Privacy Act;

b. the California Constitution, which guarantees its citizens the right to privacy; and

c. the Fourth Amendment right to privacy concerning personal computing devices, including web-browsing histories, as recognized by the United States Supreme Court.

153. Plaintiffs and the California Class had a reasonable expectation of privacy in conducting their lives, including their internet browsing activities and in their electronic communications and exchange of personal information. The reality of modern life increasingly requires that much of our daily activities are conducted online. Plaintiffs and the California Class have no realistic choice or ability but to conduct their daily lives substantially in the digital world, connected to the Internet. The necessary engagement with the digital world makes average citizens' private lives susceptible to unlawful observation and recording, capable of yielding a comprehensive and intrusive chronicle of each End User. If Plaintiffs and the California Class cannot have a reasonable expectation of privacy in conducting their lives using the Internet, they can have no reasonable expectation of privacy for virtually any facet of their lives in age of the Internet of Things.

154. The nature and volume of the data collected is such that Defendant's practice of compiling comprehensive End User profiles violates Plaintiffs' and the California Class's reasonable expectation of privacy. Technological advances, such as Defendant's Undertone tracker, Perion One offering, and other means to track and compile internet activity and electronic communications,

provide Defendant with the means to assemble a comprehensive chronicle of every End User's life heretofore unseen. Defendant even collects data about End Users' interactions with DOOH advertising.

155. Defendant's conduct is a serious invasion of privacy that is highly offensive to a reasonable person as it constitutes an egregious breach of social norms, specifically Defendant has: (a) engaged in a massive surveillance operation of Plaintiffs and the California Class for the purpose of collecting and intercepting End Users' PII without their knowledge or consent; and (b) uses the improperly collected PII to create cradle-to-grave End User profiles of each member of the California Class, including Plaintiffs, which are then sold to third parties further invading End Users' privacy.

156. Committing criminal acts against thousands of Californians is an egregious breach of social norms that is highly offensive to a reasonable person. Further, Defendant lacked a legitimate business interest in using the Perion One offering to spy on Plaintiffs and the California Class without their consent.

157. Defendant's conduct has needlessly harmed Plaintiffs and the California Class by allowing third parties to read and learn the contents of their communications, including PII, and creating a dragnet-style surveillance system. This disclosure and loss of privacy and confidentiality caused Plaintiffs and the California Class to experience mental anguish, emotional distress, worry, fear, and other harms.

158. Plaintiff and the California Class have thus been damaged by Defendant's invasion of their privacy and are entitled to, and seek, just compensation and injunctive relief, including disgorgement of profits Defendant earned off of mining Plaintiffs' and the California Class's PII and selling their End User profiles.

159. Plaintiffs and the California Class have suffered an injury in fact, resulting in the loss of money and/or property, as a proximate result of the wrongful conduct and violations of law alleged herein.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**

160. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 to 174 as if fully set forth herein.

161. Plaintiffs bring this claim individually and on behalf of the California Class against Defendant pursuant to California law.

162. Defendant has wrongfully collected, used, and sold Plaintiffs' and the California Class's PII and End User profiles without their consent for substantial profits.

163. At the expense of their privacy, Plaintiffs' and the California Class's PII and End User profiles have enriched Defendant, which Defendant unjustly retained. In sum, Defendant has been unjustly enriched by virtue of its violations of Plaintiffs' and the California Class Members' legally protected privacy rights.

164. It would be inequitable and unjust for Defendant to be permitted to retain any of the unlawful proceeds resulting from its unlawful and wrongful conduct.

165. Plaintiffs and California Class Members are entitled to equitable relief including restitution and disgorgement of all revenues, earnings, and profits that Defendant obtained because of its unlawful and wrongful conduct.

166. Defendant was aware of the benefits conferred by Plaintiffs and the California Class. Indeed, Defendant's Perion One services are premised entirely on the collection, use, and sale of PII and End User profiles to third parties. Defendant, therefore, acted in conscious disregard of the rights of Plaintiff and the California Class and should be required to disgorge all profits obtained therefrom to deter Defendant and others from committing the same unlawful actions again.

**FIFTH CAUSE OF ACTION**
**Violation of 18 U.S.C. § 2510, *et seq*.**

167. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 to 174 as if fully set forth herein.

168. Plaintiffs bring this claim individually and on behalf of the Nationwide Class against Defendant.

169. The ECPA prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

170. The ECPA protects both the sending and the receipt of communications and provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of the Act.

171. The transmission of Plaintiffs' website page visits, search terms, detailed URLs, and persistent identifiers from each website where Defendant's Perion One offering was embedded qualify as respective "communications" under the ECPA, as set forth in 18 U.S.C. § 2510(12).

172. The ECPA defines "contents" of electronic communications as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

173. Under the ECPA, an interception occurs when there is the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

174. The ECPA defines "electronic, mechanical, or other device," as "any device […] which can be used to intercept a[n] […] electronic communication." 18 U.S.C. § 2510(5).

175. Defendant's Undertone and Vidazoo trackers and other tracking technologies in its Perion One offering are devices within the meaning of the ECPA.

176. By using the Undertone and Vidazoo trackers and Perion One offering as described herein, Defendant intentionally intercepted, attempted to intercept, or procured another person to intercept Plaintiffs' and the Nationwide Class's electronic communications in violation of the ECPA.

177. Additionally, Defendant knew or should have known that the information in its End User profiles was obtained through the interception of electronic communications, thereby violating 18 USC § 2511(1)(d).

178. Defendant was not acting under the color of law when it intercepted Plaintiffs' and the Nationwide Class's electronic communications and was instead acting for the purpose of committing a criminal or tortious act.

179. The compiling and use of the contents of the intercepted communications to facilitate the creation of detailed profiles on Plaintiffs and the Class and then making those profiles available

through the data marketplace for sale are illegitimate purposes under the ECPA and constitute a violation of the California Constitution and the tort of intrusion upon seclusion,

180. Plaintiffs and the Nationwide Class did not consent to Defendant's internet-wide tracking and creation of End User profiles.

181. For each and every violation of the ECPA, Plaintiffs seeks statutory damages on behalf of herself and the Nationwide Class.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray on behalf of themselves, and all others similarly situated, for judgment against Defendant as follows:

a. certifying the Classes as requested herein, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

b. an award, as allowed by law, for actual damages, compensatory damages, statutory damages, and punitive damages;

c. equitable relief compelling Defendant to adopt appropriate policies and practices to disable the Perion One offering unless End Users opt into use of Defendant's tracking technologies on each website where the technology is embedded;

d. equitable relief requiring restitution and/or disgorgement of revenues that Defendant wrongfully retained;

e. an award for reasonable attorneys' fees and costs under the laws outlined above, the common fund doctrine, and any other applicable law, including under Cal. Code Civ. Proc. § 1021.5;

f. costs and any other expenses, including expert witness fees, incurred by Plaintiffs in connection with this action;

g. pre- and post-judgment interest on any amounts awarded; and

h. such further relief as may be just and proper.

/ / /

/ / /

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial for all of the claims so triable.

Dated: August 6, 2026

**LYNCH CARPENTER, LLP**

By: */s/ (Eddie) Jae K. Kim*

(Eddie) Jae K. Kim (SBN 236805)
ekim@lcllp.com
Tiffine E. Malamphy (SBN 312239)
tiffine@lcllp.com
9171 Towne Centre Drive, Suite 180
San Diego, CA 92122
Tel.: (619) 762-1910
Fax: (724) 656-1556

*Attorneys for Plaintiffs and Proposed Class*